IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JONATHAN IRVING HITT,<br>    Petitioner, | §<br>§<br>§ | |
| V. | § | A-05-CV-618-SS |
| | § | |
| NATHANIEL QUARTERMAN,<br>Director, Texas Dept. of<br>Criminal Justice-Correctional<br>Institutions Division,<br>    Respondent. | §<br>§<br>§<br>§<br>§ | |

**REPORT AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE**

To:   The Honorable Sam Sparks, United States District Judge

The Magistrate Judge submits this Report and Recommendation to the District Court pursuant to 28 U.S.C. §636(b) and Rule 1(e) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrates, as amended, effective December 1, 2002.

Before the Court are Petitioner's First Amended Application for Habeas Corpus under 28 U.S.C. § 2254 (Document 7); Respondent's Answer (Document 13); and Petitioner's reply (Document 20). Petitioner, represented by counsel, has paid the filing fee for his application. For the reasons set forth below, the undersigned finds that Petitioner's application for writ of habeas corpus should be denied.

**STATEMENT OF THE CASE**

**A.    Petitioner's Criminal History**

According to Respondent, the Director has lawful and valid custody of Petitioner pursuant to a judgment and sentence of 33rd District Court of Blanco County, Texas, in cause number 691A,

styled The State of Texas v. Jonathan Irving Hitt. Ex parte Hitt, Appl. No. 61,415-01 at 5-13. A jury found Petitioner guilty of eight counts of indecency with a child and assessed three three-year sentences and five ten-year sentences as punishment. Id. at 22-32. On July 26, 2001, the Third Court of Appeals of Texas affirmed the judgment on appeal. Hitt v. State, 53 S.W.3d 697 (Tex. App.–Austin 2001, pet. ref'd). The Texas Court of Criminal Appeals refused Hitt's petition for discretionary review on February 13, 2002.

Petitioner filed a state writ application on May 2, 2003. Ex parte Hitt, Appl. No. 61,415-01 at 53-63. On June 29, 2005, the Texas Court of Criminal Appeals denied Petitioner's application without written order on the findings of the trial court after hearing. Id. at cover. Petitioner filed this federal application by counsel on July 8, 2005.

**B.     Factual Background**

The factual background of this case is found in the Court of Appeals opinion and is repeated below.

> S.S. was born on September 22, 1985.  He was brought to the Christ of the Hills Monastery in Blanco County by his mother, Abba St. Germaine, when he was eight and a half or nine years old.  She felt his schooling there and the surroundings might be the answer to the difficulties S.S. had experienced in the first and second grades of school in Houston and in a fatherless home.
>
> St. Germaine first visited the monastery when she was three months pregnant with S.S. at the suggestions of friends.  Thereafter, she often visited the monastery and became acquainted with the members of the institution, which was associated with the Russian Orthodox Church.  St. Germaine related that she was married at the monastery and that S.S. was baptized there. A monk at the monastery, Father Benedict (Sam Green), was godfather to S.S.
>
> St. Germaine knew there was no formal school at the monastery at the time she left S.S. there.  There were plans for starting a school, however, and it was understood that S.S. would receive instructions from the monks until then.  At first,

St. Germaine was pleased with S.S.'s progress and emotional growth, but she later became concerned about S.S.'s schooling.

After about a year and a half, S.S. was expelled or asked to leave the monastery because the residents there were frustrated and angry about S.S.'s conduct. Petitioner later flew to Houston to consult with St. Germaine. It was decided that S.S. should return to the monastery. Sometime after his return, S.S. was permitted to become a novice. St. Germaine became irritated because the monastery did not consult her before permitting S.S. to become a novice and because the monastery did not cooperate with an Austin company she retained to assist the monastery with S.S.'s education. On St. Germaine's visits to the monastery, S.S. denied any physical or sexual abuse and she observed no change in his personality or behavior.

Subsequently, there was a group meeting at the monastery to confront S.S. about his veracity, his lack of responsibility in avoiding his fair share of work assignments, and his attempts to get other children at the monastery in trouble with the monks. After the group's grievances were discussed, another meeting was scheduled to focus on a remedy. St. Germaine withdrew S.S. from the monastery in November 1997 prior to the second meeting.

After S.S.'s return to Houston, individuals at the monastery called to inquire about his welfare. S.S. refused to talk to them. St. Germaine also received a telephone call from Michael Woodson, a San Antonio attorney, inquiring why S.S. had been removed from the monastery and imparting certain information to her. Some months after S.S. left the monastery, he had difficulties with a coach at his public school. St. Germaine asked S.S. why he seemed to have trouble with male authority figures. S.S. blurted out that appellant had raped him twice while he was at the monastery. S.S. subsequently gave a statement to the Blanco County district attorney that he had been raped nine times by appellant.

S.S. was fourteen years old at the time of the October 1999 trial. He testified that in the summer of 1997, before his twelfth birthday, Petitioner began inviting him to spend Saturday nights at the Elder House on the grounds of the monastery. Father Benedict and his elderly mother lived there with appellant. The house was air conditioned, unlike S.S.'s regular sleeping quarters. S.S. slept in a room with Petitioner which contained twin beds. The second night S.S. was there, Petitioner climbed into his bed and slept with him. On another night, while in bed with S.S., Petitioner began hugging S.S. and kissing him on the cheek and neck. S.S. felt awkward, confused, and embarrassed, but did not say anything to Petitioner.

On a night in June 1997, Petitioner took off all his clothes and crawled into bed with S.S. During that night, Petitioner hugged and kissed S.S., who was scared and felt that "it was really wrong." The next day, Father Benedict sent for S.S. and

3

told him that Petitioner had revealed the incident. Father Benedict instructed S.S. that the conduct was "perfectly okay" and S.S. was not to tell anyone, especially his mother.

S.S. testified that on another night Petitioner, completely naked, got in bed with him and tried to take S.S.'s clothes off, but did not succeed. S.S. related that Petitioner had an erection and he could feel Petitioner's genitals on his body. S.S. was instructed to get on top of Petitioner and he believed Petitioner was moving underneath him while with an erection. Three or four weeks later, Petitioner had S.S. take his clothes off, and while they were both naked, told S.S. to get on top of him in S.S.'s bed. S.S. could feel Petitioner's genitals on his body. Petitioner ejaculated during this incident.

S.S. testified that a number of these incidents occurred in June, July, and August 1997, but he could not keep up with all the dates. He testified that the last time he and Petitioner were together nude in his bed, Petitioner had him touch Petitioner's genitals, and that Petitioner ejaculated. Despite Father Benedict's advice, S.S. felt repulsed, ashamed, and that it was wrong. S.S. did not make an earlier outcry because he was scared.

Michelle Howard, a housekeeper at the Elder House, testified that when she cleaned house on Sunday mornings, she frequently found only one bed had been used in the bedroom where Petitioner and S.S. had spent the night. Richard Martinez and Charles Belcher, a printer and a professor employed at the monastery, said they saw Petitioner and S.S. on a bed together in a small room off the monastery's kitchen on different occasions prior to the times alleged in the indictment. They were fully clothed on each occasion. Susan Packwood, a social worker and psychotherapist, treated S.S. for nine months after his delayed outcry to his mother. She testified that S.S. exhibited the behavior characteristic of a child who had been sexually abused. The defense witnesses included Dr. Robert Leo Jimenez, a psychiatrist from San Antonio. Petitioner had gone to Dr. Jimenez and asked for an evaluation. Dr. Jimenez testified that he listened to Petitioner's account of events and told Petitioner that he would have to be tested to see if Petitioner was being truthful. Petitioner was given a battery of psychological tests by Dr. Gary Bernard, whose report was studied by Dr. Jimenez. In analyzing the test results, Dr. Jimenez concluded that Petitioner was "telling the truth"; that there was "not a shred of evidence" that Petitioner fit the profile of a pedophile; and that Petitioner had come from a very good family and not the type of "family background that I have just described."

The art teacher at the monastery and three former students testified that S.S.'s reputation for truthfulness was "bad." Some of these witnesses were allowed to describe incidents or difficulties S.S. had created.

> At the monastery, Alma O'Hair, a one-time close friend of S.S.'s mother, related that she introduced St. Germaine to the monks at the monastery. She testified that while S.S. was at the monastery, St. Germaine revealed to her that she had strong romantic feelings for Petitioner. St. Germaine had earlier denied having such feelings.
>
> Petitioner testified to his background, his seminary training, and his becoming Father Jeremiah. He was opposed to accepting S.S. at the monastery at the time when no school existed. He described his efforts to assist S.S., S.S.'s expulsion from the monastery, his own trip to Houston to discuss S.S.'s future, and the decision to allow S.S. to return to the monastery. Petitioner stated that S.S.'s mother had expressed her strong romantic feelings for him and that he rebuffed her because of his vows of celibacy.
>
> Petitioner denied ever having been in bed with S.S., and specifically denied the allegations in the indictment and any other acts of sexual abuse. He related that as a result of the criminal charges, he was now a suspended monk "in limbo" and that the Russian Orthodox Church had withdrawn authorization for the monastery. Petitioner mentioned the civil lawsuit against the monastery brought by S.S. and his mother subsequent to the criminal charges being filed.
>
> In rebuttal, the State called Dr. David Poole, a psychologist from Austin. Dr. Poole testified that he had examined the psychological report on Petitioner prepared by Dr. Bernard for Dr. Jimenez. He said,
>
>> All you have reflected in the test results is that apparently if sex abuse did occur that it wasn't as a result of a mental illness, it wasn't a result of a personality disorder and that there appears to be no significant abiding guilt or anxiety associated with the act if it occurred.
>
> Dr. Poole added that no one can tell from psychological testing whether certain acts such as sexual abuse occurred.

Hitt v. State, 53 S.W.3d 697, 701-03 (Tex. App.–Austin 2001, pet. ref'd).

**C.   Petitioner's Grounds for Relief**

Petitioner raises the following grounds for relief:

1. The prosecution suppressed evidence material to Petitioner's case regarding the motion to transfer venue;

2. The prosecution assisted witnesses in providing, or failed to prevent those witnesses from providing, false testimony during the hearing on the motion to transfer venue;

3. Bennett, one of Petitioner's previous attorneys, assisted the prosecution thereby violating Petitioner's due process rights;

4. Petitioner received ineffective assistance of counsel when Bennett, having acted as Petitioner's attorney at one time in the investigation and/or prosecution of the case, assisted the prosecution;

5. The state court abused its discretion in handling certain evidence, which amounted to a denial of Petitioner's constitutional right to confront the witnesses against him;

6. Petitioner is actually innocent of the crimes for which the jury convicted him; and

7. Petitioner received ineffective assistance of counsel.

In his reply, Petitioner withdraws claims 5, 6 and 7. Accordingly, the Court will only address the first four claims.

**D.   Exhaustion of State Court Remedies**

Respondent contests that Petitioner has exhausted his state court remedies regarding the first, and fifth claims brought in this application. Specifically, Respondent alleges that Petitioner has presented material additional evidentiary support regarding the alleged Brady violation to this federal court that was not presented to the state court. Respondent also contests the exhaustion of the actual innocence claim, but does not move to dismiss this application. Rather, Respondent argues the claim is procedurally barred.

## DISCUSSION AND ANALYSIS

**A.   The Antiterrorism and Effective Death Penalty Act of 1996**

On April 24, 1996, the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996 ["AEDPA"], which radically altered the standard of review by this Court in

federal habeas corpus proceedings filed by state prisoners pursuant to Title 28 U.S.C. § 2254. Under the AEDPA's new standard of review, this Court cannot grant Petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings unless the adjudication of that claim either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, 28 U.S.C. § 2254(d)(1)-(2).

The "contrary to" requirement "refers to the holdings, as opposed to the dicta, of ... [the Supreme Court's] decisions as of the time of the relevant state-court decision." Dowthitt v. Johnson, 230 F.3d 733, 740 (5th Cir. 2000) (quoting (Terry) Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 1523 (2000)). The inquiry into whether the decision was based on an "unreasonable determination of the facts" constrains a federal court in its habeas review due to the deference it must accord the state court. See id.

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by ... [the Supreme Court] on a question of law or if the state court decides a case differently than ... [the Supreme Court] has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from ... [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id. at 740-41.

Section 2254(d)(2) speaks to factual determinations made by the state courts. See 28 U.S.C. § 2254(e)(1). While we presume such determinations to be correct, the petitioner can rebut this presumption by clear and convincing evidence. See id. Absent an unreasonable determination in

7

light of the record, we will give deference to the state court's fact findings. See id. § 2254(d)(2). With these principles in mind, this Court must now turn to the issues raised by the pleadings in this cause.

**B.      Brady Claim**

In his first ground for relief, Petitioner argues that the prosecution suppressed evidence material to his case regarding the motion to transfer venue. Specifically, Petitioner contends that the State failed to disclose that there was widespread hatred in Blanco County for the monastery where Petitioner lived. Petitioner asserts that an assistant district attorney, John Bennett, was aware of that information. Petitioner relies on a hearing held in federal court in a habeas corpus action filed by James Tenny in which John Bennett testified. Bennett was Tenny's defense counsel but later became employed as a prosecutor with the Blanco County District Attorney's Office. Petitioner asserts that Bennett admitted that he had personal knowledge that the hatred for the monastery in Blanco County rose to the level of a "community wide riot and community wide resentment." Petitioner contends the prosecutors had a duty to disclose that information.

In a related ground for relief, Petitioner alleges the prosecution assisted witnesses in providing, or failed to prevent those witnesses from providing, false testimony during the hearing on the motion to transfer venue, thus affecting his right to a fair trial. Petitioner does not specify what testimony he believes is false.

The state court held a hearing on Petitioner's state writ application in which Petitioner made these same claims. The court made the following findings and conclusions:

> 2.      John Bennett was not in possession of any material fact that would support any conclusion that there was any widespread animosity, hate or other negative reaction toward the monastery;

8

3. No witness on any venue facts gave false testimony;

4. The State had neither actual nor imputed knowledge of any specific evidence which showed substantial or widespread hatred of the monastery;

5. The motion to transfer venue was considered in a separate pretrial hearing but that matter was carried to trial, with the concurrence of both sides, where any potential bias was fully explored during *voir dire*;

8. At trial an extensive juror questionnaire was fashioned by the Court with substantial input from both sides.

9. Such questionnaire was, in substantial part, designed to elicit potential bias regarding the monastery, the monks in general or defendant Hitt in particular.

10. During *voir dire* of approximately 105 veniremen fewer than half of them had any knowledge at all of the monastery and fewer than a handful expressed even a hint of potential bias in that regard.

11. Attorney Bennett possessed no material fact or knowledge that should have been disclosed to the defense under *Brady* or any other rule of law.

SHCTr 131-32. The state court further found that the court and the attorneys from both sides believed that the jury questionnaire would elicit any bias. SCHHrg 134. The court concluded there was no Brady violation. SHCTr 133.

In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held the suppression by the prosecution of evidence favorable to an accused after a request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution. To establish a Brady violation, a party must prove (1) the prosecutor suppressed or withheld evidence (2) which was favorable and (3) material to the defense. Id. at 87, 83 S. Ct. at 1196-97; Allridge v. Scott, 41 F.3d 213, 217 (5th Cir. 1994), cert. denied, 514 U.S. 1108, 115 S. Ct. 1959 (1995). The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. United States

v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985).  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial.  Id.  Brady encompasses evidence that may be used to impeach a witness's credibility.  Id. at 676, 105 S. Ct. at 3380.  There is no Brady violation if the defendant, using due diligence, could have obtained the information. Williams v. Scott, 35 F.3d 159, 163 (5th Cir. 1994), cert. denied, 513 U.S. 1137, 115 S. Ct. 959 (1995) (citing United States v. Ramirez, 810 F.2d 1338, 1343 (5th Cir.), cert. denied, 484 U.S. 844, 108 S. Ct. 136 (1987)).

Bennett testified at the Tenny hearing to explain why he did not call Petitioner and another monk as witnesses in Tenny's trial.  He provided his opinion that the community resented the monastery.  This is not Brady evidence.  It was merely Bennett's opinion.  Morever, Petitioner could have obtained his own information related to the attitude or beliefs of the community about the monastery using due diligence.  In fact, Petitioner provided affidavits in support of his motion to change venue in which affiants, including Petitioner, stated their beliefs about the community views of the monastery.  Tr 61-62, 64, 66.  Thus, Petitioner had information relating to the community's view of the monastery.

The state court's finding that Bennett possessed no material fact or knowledge that should have been disclosed to the defense under Brady and its conclusion that there was no Brady violation was not unreasonable.  Accordingly, Petitioner's claim does not warrant federal habeas relief.

Petitioner also raises a Giglio claim.  A Giglio violation occurs when a state convicts a defendant based on testimony the prosecution knows is perjured and that prejudices the defendant. See Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763 (1972).  A defendant's due process rights are violated if a state "knowingly uses perjured testimony at trial or allows untrue testimony to go

10

uncorrected." Creel v. Johnson, 162 F.3d 385, 391 (5th Cir. 1998).  To succeed in showing a due process violation from the use of perjured testimony, a petitioner has the burden of showing that false testimony was given, the falsity was material in that it would have affected the jury's verdict, and the prosecution used the testimony knowing it was false.  Giglio, 405 U.S. at 154, 92 S. Ct. at 766; Creel, 162 F.3d at 391 (three-part test presents a mixed question of law and fact); Nobles v. Johnson, 127 F.3d 409 (5th Cir. 1997).

The perjury must have been material to the conviction; in other words, a new trial is required "'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" Creel 162 F.3d at 391 (quoting United States v. Agurs, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397 (1976)).  The perjury is not material if there is only "'[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial.'" Id. (quoting Agurs, 427 U.S. at 109-10, 96 S. Ct. at 2400).  The materiality prong is not met when the allegedly perjured statements "have nothing to do with [the defendant's] guilt or innocence" and evidence of guilt is "overwhelming."  United States v. Washington, 44 F.3d 1271, 1282 (5th Cir.1995).

Petitioner fails to identify the witnesses he alleges committed perjury, or to explain how that testimony was false.  Petitioner has also failed to provide any evidence that the prosecution had knowledge that the testimony was false.  Instead, Petitioner provides only his own bare and self-serving conclusion that the prosecution offered known perjured testimony.  Finally, Petitioner has failed to demonstrate that the witness' testimony was material, and the outcome of the motion to transfer venue hearing, and ultimately his trial, would have been different absent this testimony.

The state court found that no witness on any venue facts gave false testimony. Having independently reviewed the entire state court record, this Court finds nothing unreasonable in the state court's application of clearly established federal law or in the state court's determination of facts in light of the evidence. Accordingly, Petitioner's claim does not warrant federal habeas relief.

**C.     Conflict of Interest**

Petitioner argues that his due process rights were violated when one of his attorneys, John Bennett, assisted the prosecution. In a related claim Petitioner argues he received ineffective assistance of counsel when Bennett, having acted as Petitioner's attorney during the investigation or prosecution of the case, later assisted the district attorney. Petitioner asserts he and Bennett had attorney-client discussions about the basis for the criminal charges, possible defenses, and how Petitioner should proceed based on the charges. Petitioner claims that Bennett, from time-to-time, actively assisted the prosecution and handled a protective order hearing to prevent the complainant from being deposed. In addition, Petitioner asserts Bennett appeared during the trial to provide support to the prosecution team. Petitioner concludes Bennett was acting under an actual conflict of interest, and as such, he is not required to show prejudice. In his original application for habeas corpus relief Petitioner alternatively concluded that he was prejudiced as a result of Bennett's actions and/or that his due process rights were violated.

At the beginning of Hitt's criminal trial, defense counsel raised the issue of whether Bennett's employment as an assistant district attorney presented a conflict in light of his contact with Petitioner as Tenny's defense attorney. 3 Supp SF 91. The court conducted an inquiry into the matter. Id. at 91-113. At the hearing, Bennett testified that he was not approached by Petitioner regarding representation and that he did not discuss the facts of Petitioner's case with him. Id. at 99-

100.  Bennett further testified that he never discussed anything about Petitioner's case with anyone in the District Attorney's office.  Id. at 101-02.  Specifically, Bennett testified:

> There's nothing that I know about this case.  There's nothing I have discussed with anyone about this case and be [sic] a matter of fact, I have purposely myself tried to stay away from this case, not that I have been ordered to because I know [Hitt and Green] and I like them and I like to believe they didn't do this but I don't even really know the allegations against them or what the evidence is against them.  Those things, I don't know.
>
> The only one thing that I have done in this case and that was only because we had a shortage of lawyers, . . . I was asked to . . . argue a motion for protective order in the civil case.
>
> And the only reason I was sent over here was because we were out of lawyers at the office and I would have like[d] not to have done that but I have not discussed anything with anyone in the office because I don't know anything about this case.

Id. at 102-03.  Bennett testified he had not worked on the criminal case file at all, but merely watched the voir dire in the criminal case to see the use of a jury questionnaire, which was something he wanted to observe.  Id. at 103-04.  The trial court determined there was no conflict.  Id. at 112.

Bennett also testified at the state habeas hearing regarding this matter.  Bennett testified that as Tenny's defense attorney, he spoke with Hitt because Hitt was a potential witness.  SHCHrg 23-24.  Bennett testified that during this interview, he and Hitt must have talked about Hitt's then-pending charges.  Id. at 24-25.  According to Bennett, he did not use Hitt as a witness because of those pending charges.  Id. at 26.  Bennett further testified that he never represented Hitt and that they did not have an attorney-client relationship.  Id. at 47-48.  According to Bennett, he did not give Hitt any legal advice regarding Hitt's case.  Id. at 111.  Bennett further testified that he never discussed representing Hitt, and had no involvement with Hitt's criminal case.  Id. at 112-13.  With regard to the civil matter, Bennett testified that civil attorneys representing the child victim in a

separate civil case wanted to depose the State's witnesses, and Bennett asked the court to abate the taking of the depositions until the criminal case against Petitioner had been tried. <u>Id.</u> at 46-47, 113.

Sam Oatman, the District Attorney and a prosecutor in the Hitt case, testified at the state habeas hearing that to his knowledge he had not discussed Hitt's case with Bennett. <u>Id.</u> at 87. Oatman denied trying to discuss Hitt's case with Bennett. <u>Id.</u> Oatman did inform the court during the court's inquiry at trial into a possible conflict of interest that Oatman asked Bennett once in a kidding fashion whether he knew anything about the Hitt case. 3 Supp SF 92. According to Oatman, Bennett refused to talk about it and nothing else was ever said. <u>Id.</u> at 92-93.

On state habeas review the state court found:

1. No attorney/client relationship was ever established between attorney John Bennett and Defendant Hitt in relationship to Defendant Hitt's ultimate case.

6. There was no conflict regarding Mr. Bennett, but as discussed during defense counsel's argument, the Chinese wall concept was ordered out of an abundance of caution.

7. Mr. Bennett did not participate in the trial of Defendant Hitt's case in court.

12. Attorney Bennett, while as assistant District Attorney in the 33rd Judicial District participated in many other hearings, pleas and proceedings, none of which were in any way related to defendant Hitt's case.

SHCTr 131-32. The state court concluded:

2. Assistance of Counsel for the Defendant was effective, and no issue of ineffective assistance of counsel was seen at trial or raised by the evidence.

4. Attorney Bennett's employment with the District Attorney's office did not affect defendant Hitt's substantive or procedural due process.

5. No attorney-client relationship was formed between defendant Hitt and attorney Bennett.

SHCTr 133.

Petitioner has not rebutted the state court's factual findings with clear and convincing evidence. Rather, Petitioner in his reply argues Bennett's actions could only lead one to conclude there were attorney-client discussions between him and Petitioner. Petitioner argues that the state court's conclusion that no attorney-client relationship existed fails to recognize Petitioner was interviewed by Bennett because he was a potential witness in the Tenny trial. These arguments are unpersuasive. Interviewing a person who is a witness in a case in which an attorney is defense counsel is a far cry from representing that person. Clearly no attorney-client relationship existed, and Petitioner therefore has no claim of ineffective assistance of counsel.

In addition, Bennett's interview of Petitioner did not violate his due process rights. The state court specifically found that Bennett did not participate in Petitioner's criminal trial and Bennett's employment with the District Attorney's office did not affect Petitioner's substantive or procedural due process. As explained in the state court proceedings, the Bennett's only involvement related to a motion for protective order in the civil case brought by the alleged victim. As Petitioner's criminal case was not affected by Bennett's employment, Petitioner was not prejudiced. Having independently reviewed the entire state court record, this Court finds nothing unreasonable in the state court's application of clearly established federal law or in the state court's determination of facts in light of the evidence. Accordingly, Petitioner's claim does not warrant federal habeas relief.

## RECOMMENDATION

It is recommended that Petitioner's application for writ of habeas corpus be denied.

## OBJECTIONS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are

being made. The District Court need not consider frivolous, conclusive, or general objections. Battles v. United States Parole Comm'n, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within ten (10) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the district court. See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140, 150-153, 106 S. Ct. 466, 472-74 (1985); Douglass v. United Servs. Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

To the extent that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is ORDERED to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 29th day of October, 2007.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE